# Department of Social Welfare v. Patrick Miller

[595 A.2d 288]

No. 89-548

Present: **Allen, C.J., Gibson, Dooley and Johnson, JJ.**

Opinion Filed June 21, 1991

*Thomas L. Peairs*, Waterbury, for Plaintiff-Appellee.

*Robert Andres*, Burlington, for Defendant-Appellant.

**Johnson, J.** Defendant Patrick Miller appeals from a jury finding that he is the father of Allen Moore. Primarily, he challenges the admission, at trial, of the results of blood tests establishing a high probability that he is the father of the child. He also claims that error occurred when a picture related to another paternity case involving him was handled by the Department of Social Welfare in the presence of the jury and when, during closing argument, the Department of Social Welfare commented on his failure to present alibi witnesses. We affirm.

In 1984, April Moore met Patrick Miller during the week of the Swanton Festival, which was held at the end of July. Both parties testified to "seeing" each other for the next couple of months, but although Ms. Moore claimed that the couple engaged in sexual relations, Mr. Miller claimed that they did not. On April 26, 1985, Allen Moore was born to April Moore. No father was listed on the child's birth certificate, but when Ms. Moore was required to name the child's father in applying for welfare benefits, she identified Patrick Miller. Mr. Miller denied paternity, and this action ensued. A jury found Patrick Miller to be the father of Allen Moore, and this appeal followed.

## I.

### Admissibility of the Test Results

Defendant challenges the admission of blood test results which established a 97.87% probability that he is the father of Allen Moore. Specifically, he contends that (1) no adequate chain of custody was established for the blood samples used for the tests; (2) the laboratory procedures for testing were not followed; (3) blood taken for testing in an unrelated paternity case also involving him was used to perform a final test with respect to Allen Moore; and (4) the doctor who testified at trial did not himself perform the tests.

A sufficient chain of custody for a test sample exists if the circumstances establish reasonable assurance of the identity of the sample. *State v. Comstock*, 145 Vt. 503, 506, 494 A.2d 135, 137 (1985). The chain of custody must be sufficient to "'al-

low a trial court to rule favorably on its relevance, and also on its admissibility as against any possible prejudice to the respondent.'" *State v. Ross*, 130 Vt. 235, 240, 290 A.2d 38, 41 (1972)(quoting *State v. Auger*, 124 Vt. 50, 57, 196 A.2d 562, 567 (1963)).

Two witnesses testified at trial as to the chain of custody. The phlebotomist who drew the various samples testified about her method of identifying them. She stated that the individual tubes are sealed and labeled and mailed with accompanying paperwork which also identifies the samples.

Dr. Osborne, an associate director of the department of paternity evaluation of Roche Laboratory, testified about the method employed for tracking and testing the samples at the laboratory. He testified that an employee is assigned to opening packages received. That employee must examine the tubes of blood for tampering and ensure that the labels match the accompanying paperwork. Any problems or discrepancies are brought to the attention of a supervisor, but if all is in order, the receiving employee initials the chain-of-custody section of the accompanying sheet. The sheets were initialed for the samples involved here.

Each sample is then subjected to two identical tests performed by two different technicians. The results are noted and compared and must be identical. Technicians are expected to note any irregularities in their reports, and if the results of the tests differ, the tests must be performed anew. The technicians enter the final results in the laboratory computer. The reports in the case at hand did not contain any indication of irregularities, and the results of the tests were identical.*

The files containing the reports are then submitted to the calculations department, where operators command the computer to make the necessary calculations. Dr. Osborne reviews the computer printouts and the raw data sheets and compares these to ensure they correspond. If they do, he signs the reports. The reports in this case are signed. Moreover, before

---

* Defendant's contention that seventeen people handled the samples is incorrect. Each individual sample was handled by only four people: the phlebotomist, the employee in charge of receiving the samples and two technicians who performed identical tests on each sample.

trial, Dr. Osborne hand-calculated the relevant results to ensure that the computer calculations are accurate. They are.

 We hold that the evidence established reasonable assurance of the identity of the blood samples and test results. See *State v. Comstock*, 145 Vt. at 506, 494 A.2d at 137. The procedure employed by Roche Laboratory to ensure the integrity of the tests was certainly sufficient to "'allow a trial court to rule favorably on [the test results'] relevance, and also on [their] admissibility as against any possible prejudice to the respondent.'" *Ross*, 130 Vt. at 240, 290 A.2d at 41 (quoting *Auger*, 124 Vt. at 57, 196 A.2d at 567). Several of our prior cases involve challenges to the chain of custody of samples. Generally, chain of custody is established if a sample is sealed and labeled upon collection and received by the technician performing the test in that condition. See *State v. Comstock*, 145 Vt. at 506–07, 494 A.2d at 137; *Ross*, 130 Vt. at 241-42, 290 A.2d at 42; *Auger*, 124 Vt. at 57–58, 196 A.2d at 567. Direct evidence concerning the situation of the sample from the time it is mailed and the time it is delivered to the technician for testing is not necessary. See *Ross*, 130 Vt. at 241, 290 A.2d at 42. In this case a combination of direct and documentary evidence established that the samples were sealed and labeled upon collection, that they were received by the laboratory in the same condition, and that two identical tests performed on each sample yielded identical results.

Defendant's allegation that the laboratory did not follow its own procedures in performing the tests is without merit. Three types of blood tests were involved. First, red cell tests and human leukocyte antigen tests were performed. Doctor Osborne testified that until 1988 it was the policy of the laboratory to perform these tests within six months of each other, on the various samples to be compared. This procedure was followed for the red cell tests and human leukocyte antigen tests. In addition, samples were subjected to a series of red cell enzymes and serum proteins tests because the red cell tests established only a 94.18% probability of paternity. The red cell enzymes and serum proteins tests on the various samples were not performed within six months of each other. But, according to Dr. Osborne's testimony, the six-month policy does not apply to the

red cell enzymes and serum proteins tests. Accordingly, there was no breach of laboratory operating procedures.

■ Dr. Osborne also testified that the red cell enzymes and serum proteins tests require freezing of the blood sample within six weeks after the drawing. Defendant complains that there was no evidence that the samples were in fact frozen within the required time frame. Dr. Osborne testified, however, that samples are habitually frozen within the required time frames and that if this had not been done, there would have been fuzziness in the typings and the test results would have been disregarded. In the absence of evidence to the contrary, this testimony was sufficient to establish that the procedures employed by Roche Laboratory were followed in this case.

■ Defendant contends that error occurred because the laboratory used his blood, drawn for testing in a different paternity challenge, to perform the red cell enzymes and serum proteins test for this case. He argues that he was unable to cross-examine the phlebotomist about the possibility of misidentification of the blood drawn for the unrelated paternity case without revealing to the jury that a different case was involved. We see no reason why defendant could not cross-examine using the words mother and child rather than naming the particular individuals. Defendant in fact fully cross-examined the witnesses about the routine established for blood collection and testing, and the procedures used in this particular case. Defendant's blood did not change in the context of two different cases. Accordingly, use of the same sample to perform tests for two different cases was not error.

■ Defendant argues that although Dr. Osborne is the custodian of the records and reports related to the testing, he could not provide a foundation for the introduction of the test results because he did not personally perform the diverse tests. The records and reports containing the test results were business records. See V.R.E. 803(6). Rule 803(6) does not require that the foundation for a business record be established by the person who made the record. Rather, the rule exempts from exclusion:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses,

> made at or near the time by . . . a person with knowledge, if
> kept in the course of a regularly conducted business activ-
> ity, and if it was the regular practice of that business activ-
> ity to make the memorandum, report, record, or data
> compilation, *all as shown by the testimony of the custodian*
> or other qualified witness, unless the source of information
> or the method or circumstances of preparation indicate
> lack of trustworthiness.

(Emphasis added.) Dr. Osborne, the custodian of the records, who personally supervised the technicians performing the tests in question and was instrumental in establishing the procedures employed in the paternity evaluation section of Roche Labora-tory, verified that it was the regular business practice of techni-cians at Roche Laboratory to make the records in question at the time the tests were performed. His testimony established the reliability of the method of preparing the records and that the entries were made by various individuals having first-hand knowledge of the information recorded. Thus, the requirements of Rule 803(6) were met, and the records were properly admit-ted. Moreover, Dr. Osborne, who without objection from de-fendant was certified by the court as an expert on the application of genetic blood testing in paternity evaluation, was competent to give an opinion of the probability of paternity based on the information contained in these admissible records.

## II.

### *The Handling of a Picture Pertaining to Another Paternity Suit in the Presence of the Jury*

Defendant challenges the "display" of a photograph of an-other woman and child to the jury. Defendant's characterization of the incident is misleading. At trial, during the course of the pre-admission examination of the records and reports of the red cell enzymes and serum proteins tests, defendant observed and recognized from his seat a photograph of a woman and child unrelated to the instant case, attached to the reports. Defend-ant moved for a mistrial, and a bench conference ensued. It was then discovered that, because the blood for the red cell enzymes and serum proteins tests was drawn in connection with another case involving another woman and child, that woman's name

and photograph appeared with the records. The trial court ordered that the photograph be removed from the documents and that the other woman's name be covered. It denied defendant's motion for a mistrial because the documents had not yet been introduced into evidence and submitted to the jury. Defendant argued that he was able to recognize the other woman from where he was sitting. The court concluded, however, that defendant's claim that the jury must also have seen and identified the picture as that belonging to a woman different from the complaining witness in this case was too speculative.

"[M]otions for mistrial are committed to the sound discretion of the trial court and should not be granted unless the moving party demonstrates prejudice. The trial court's decision will stand on appeal unless the court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable." *State v. Roberts*, 154 Vt. 59, 73, 574 A.2d 1248, 1255 (1990)(citations omitted). The trial court noted, in denying the motion, that it had not observed the identity of the woman in the photograph and that it did not believe the jury had done so either. In these circumstances, the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

Defendant also complains that the court made no cautionary instruction to the jury pertaining to the incident. He did not, however, request any such instruction, nor did he object to the jury instructions given. Alluding to the incident would certainly have alerted the jury to the existence of another case. Having resolved to deny defendant's motion for a mistrial, the court did not abuse its discretion in refraining from referring to the incident in the presence of the jury, particularly where defendant made no request for a cautionary instruction.

### III.

*Closing Argument of the Department of Social Welfare*

Defendant contends that reversible error occurred during closing argument when the attorney for the Department of Social Welfare commented on defendant's failure to present alibi witnesses. Defendant objected to the comment and moved for mistrial. The court instructed the jury that "the number of

witnesses is not persuasive as far as your consideration goes" and ordered it to disregard the attorney's comment. "'The decision as to whether or not [an attorney's] comment is prejudicial is clearly within the sound judgment and discretion of the trial court.'" *State v. Callahan*, 155 Vt. 571, 578, 587 A.2d 970, 974 (1991) (quoting *State v. Norton*, 134 Vt. 100, 105, 353 A.2d 324, 327 (1976)). Here, the court took immediate corrective action and emphasized, in its instructions to the jury, that the Department of Social Welfare bore the burden of proof by a preponderance of the evidence. It also stressed that the arguments of counsel were not evidence and that the jury's decision should be based solely on the evidence. The court did not abuse its discretion in refusing to grant defendant's motion for mistrial.

*Affirmed.*